IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| LINDA JONES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:12-cv-0075 |
| | ) | |
| WILLIAMSON COUNTY BOARD | ) | Chief Judge Sharp |
| OF EDUCATION, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Plaintiff Linda Jones filed this action in January 2012 against the Williamson County Board of Education, asserting claims of harassment, discrimination, and retaliation in violation of the Civil Rights Act of 1991, 42 U.S.C. §§ 1981 and 1983; Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e; the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C.A. § 623; and Tennessee state law. The plaintiff filed an Amended Complaint (ECF No. 17) on October 9, 2012, which was further amended by the agreement of the parties as noted in an order entered by Magistrate Judge Juliet Griffin on October 15, 2012 (ECF No. 18). In the Amended Complaint, the reference to claims under § 1981 were deleted from Count One; Count Four, which set forth a claim of retaliation for filing charges of discrimination "under either Title VII or the Tennessee Human Rights Act," was removed in its entirety; and pursuant to the Judge Griffin's order, all references to "common law retaliation" and Tennessee state law were omitted from other sections of the complaint.

Now before the Court is the defendant's motion for summary judgment as to all claims set forth in the Amended Complaint (ECF No. 20), filed along with a supporting memorandum of law, statement of undisputed facts, and various supporting documents (ECF Nos. 21, 22). The plaintiff filed a response in opposition to the motion, a response to the defendant's statement of undisputed facts, her own statement of facts, and a number of exhibits. (ECF Nos. 30–33.) The defendant responded to the plaintiff's statement of facts and submitted a reply brief. The motion has been fully briefed and is ripe for review.

For the reasons set forth herein, the Court will grant in part and deny in part the defendant's motion for summary judgment. Specifically, the Court will grant summary judgment in favor of the

defendant on (1) the plaintiff's claims under § 1983; (2) the plaintiff's retaliation claims; and (3) the plaintiff's Title VII and ADEA discrimination claims related to the 2010 termination of her employment. In all other respects the defendant's motion will be denied.

## I. FACTUAL BACKGROUND

The facts set forth herein are undisputed for purposes of the defendant's motion, unless otherwise indicated.

Ms. Jones began her employment with the Williamson County Board of Education in August 1989 as a part-time school cafeteria worker. She was promoted to the position of cafeteria manager in October 1989. In 2005, she was promoted to the position of Field Manager at the Williamson County Schools Child Nutrition Office. Ms. Jones enjoyed her work and was confident that she performed it well. While employed by the defendant, she completed over two hundred hours of training in school nutrition. She was certified to level three with the Tennessee School Food Service Association and was certified to train school cafeteria managers on food handling and safety issues. She was also involved in a number of professional organizations. At one point her former supervisor, James Griffith, sought to have her promoted to the position of Assistant Director of the Child Nutrition Office. She applied for the position but did not receive it. When Mr. Griffith was deployed as a member of the National Guard and the Assistant Director took another job, Ms. Jones functioned as acting director for a period of several months while also performing her own job duties.

James Griffith retired and was replaced by James Remete as Director of the Child Nutrition Office for Williamson County Schools in November 2008. At that time Mr. Remete became Ms. Jones's direct supervisor. He remained her direct supervisor until Ms. Jones was demoted from the position of Field Manager in May 2009. Mr. Remete was the responsible decision-maker for hiring, non-renewal, and discipline decisions related to Ms. Jones's employment during the relevant time period.

In May 2009, Ms. Jones was "non-renewed" for her position as Field Manager and was offered the position of cafeteria worker, which she accepted. This action resulted in a substantial decrease in compensation and hours. Ms. Jones was 47 years old at the time. In his deposition, Mr. Remete testified that his memory of his meeting with Ms. Jones in which he notified her that she was being demoted was

somewhat "fuzzy" (Remete Dep. at 39:14[1]), but he recalled that Ms. Jones mentioned to him that "she was thinking about taking a demotion." (Remete Dep. 39:3.) He stated that it "seemed like she made the comment that she just didn't know if she could . . . change over to the new direction" that the program was heading under his leadership; that was basically all he remembered. (Remete Dep. 42:1–4.) He also testified that, by the time he handed Ms. Jones the non-renewal letter in May 2009, he did not believe that she was still qualified to be a Field Manager, based primarily on his perception that she lacked the skills to communicate effectively with the cafeteria managers who reported to her. (Remete Dep. 43:3–7.) In addition, Mr. Remete testified that Ms. Jones did not communicate effectively with him: "She tended to stay away. She would say she is out in the field, and [he] would not see her all day." (Remete Dep. 44:6–9.) He did not address this with her or ask her why she was avoiding him. He felt that if she "wanted to get better, if she really care[d] about it," she would bring the issue up with him. (Remete Dep. 44:14–16.)

Mr. Remete gave three examples of specific situations that he addressed with Ms. Jones that he believed demonstrated her unfitness for the position of Field Manager. In the first, Mr. Remete states that he had "discussed" with Ms. Jones the complaints he had received from "[s]everal cafeteria managers" about her treatment of them. (Remete Aff. (ECF No. 36-3) at ¶ 3.) He alleges that he did not reveal to Ms. Jones the identity of the individuals who had complained about her behavior because he was "concerned that Ms. Jones would retaliate against them." (Remete Aff. ¶ 4.) Mr. Remete also stated that it was his perception that Ms. Jones was "not interested in wanting to improve herself" with respect to her interactions with the managers under her supervision. (Remete Dep. 34:11–20.) For her part, Ms. Jones recalls that Mr. Remete called and told her to "stop screaming at cafeteria managers." (Jones Dep. 171:7–8.[2]) Ms. Jones was perplexed and said to him, "Please tell me who they are, I need to spend time with them because they misunderstood me." (Jones Dep. 171:11–12.) Mr. Remete responded, "just don't do it any more" and "[s]lammed the phone down." (Jones Dep. 171:13–14.) Ms. Jones testified that it "would surprise [her]" that any of the managers under her supervision would complain about her

---

[1] An excerpt of Mr. Remete's deposition transcript is in the Court's record at ECF No. 22-10. The entire deposition is in the record at ECF No. 33-5.

[2] An excerpt from Ms. Jones's deposition transcript is in the Court's record at ECF No. 22-11. The entire deposition transcript is in the record at ECF Nos. 33-1, 33-2, 33-3, and 33-4.

management style. (Jones Dep. 171:21–25.) She considered this to be an instance when she was falsely accused of misconduct. (Jones Dep. 174:5–16.)

Mr. Remete also testified that he believed that Ms. Jones was not as knowledgeable about food regulations as she should have been, citing, as an example, that she was incorrectly informing cafeteria managers that precooked chicken nuggets needed to be reheated to 165 degrees, when in fact they only needed to be reheated to 140 degrees. (Remete Dep. 27:11–14.) Ms. Jones disputes the suggestion that she was not knowledgeable about food regulations and points out that she had completed two hundred hours of training in school nutrition. (Jones Dep. 158:17–24; Pl.'s Ans. to Interrog. No. 2 (ECF No. 33-7).)

Third, Mr. Remete testified that he had a "conversation" with Ms. Jones about her engaging in inappropriate work conduct when she went to cafeteria managers directly to try to get an employee transferred from one school to another, without going through Mr. Remete or the Assistant Director, Jim Rose. (Remete Dep. 21:19–24, 35:20–36:19.) Ms. Jones disputes Mr. Remete's version of this event as well, stating that she was in fact working under the direction and at the behest of Mr. Rose, but that Mr. Remete called her on the telephone, berated her for engaging in personnel issues that Mr. Rose was in charge of, and then hung up without giving her an opportunity to explain. (Jones Dep. 159:25–164:4.) Ms. Jones characterized this as another instance when she was falsely accused of misconduct. (Jones Dep. 174:5–16.)

Mr. Remete testified that after demoting Ms. Jones, he did not fill the position of Field Manager for a year. He stated:

> I was thinking we could run just with one supervisor. Another part of my role in here was to look at the department financially to see if there was places we could save money or look at the overall operation. And at the time I felt with an assistant and with another area supervisor and me getting out to the schools as much, I thought we could run it with one.

(Remete Dep. 45:11–22.) He conceded that he knew the school district was expanding and building schools rapidly, but asserted that he still believed initially that they would be able to operate with one Field Manager. In an affidavit prepared in support of the defendant's motion for summary judgment, Mr. Remete clarified that he did not remove Ms. Jones from the position of Field Manager as a result of deciding to eliminate a Field Manager position; rather, Ms. Jones was removed "due to her poor job performance," and it was only after he removed her that he decided to try to operate going forward with only one Field Manager. (Remete Aff. ¶¶ 5–7.)

The one Field Manager who remained after Ms. Jones's demotion was Brian Parkhurst, a younger male.[3] Mr. Parkhurst had been hired as Field Manager in 2006 or 2007 by James Griffith, Mr. Remete's predecessor. Mr. Parkhurst did not have an extensive background in the school nutrition field. He operated as the sole Field Manager after Ms. Jones's demotion until Ms. Jones was officially replaced in July 2010 by Libby Poteete, a woman over age 40 who was only two and a half years younger than Ms. Jones. Mr. Parkhurst voluntarily left his position in March 2011, at which time he was replaced by another male employee. Ms. Poteete remains in the Field Manager position previously occupied by Ms. Jones.

According to Ms. Jones, her problems with Mr. Remete began immediately upon his being hired. Upon their first meeting, she perceived his tone with her to be "gruffer" than it was with the other members of the office staff. (Jones Dep. 28: 11.) The others in the office staff included two other women (both secretaries), one of whom was older than Ms. Jones, and two men, one of whom, Mr. Rose, was in his 60s, but Mr. Remete was cordial when speaking with these individuals. (Jones Dep. 28:17–29:14.)

Ms. Jones testified that, during the approximately six months that Mr. Remete was her direct supervisor, in addition to the incidents addressed above, Mr. Remete routinely belittled her, telling her he did not like the way her face looked (Jones Dep. 182:25), that she was "old" (Jones Dep. 183:20), that she was "stupid" or "an idiot" (Jones Dep. 127: 16–19), that he wanted "more males" or "pretty young girls" to work for him (Pl.'s Interrog. Answer No. 7). He stated repeatedly that the place needed "new blood" or younger workers (Jones Dep. 121:2–24, 125:14–25); on at least one occasion he told Ms. Jones that they could hire two people for what he paid her (Jones Dep. 98:11–14), and another time told her he could "hire younger workers for so much less." (Jones Dep. 123:2–6.) On one occasion when Ms. Jones and Mr. Rose were engaged in setting up serving lines, Mr. Remete came in and yelled at them for not cleaning up the stock room. When Ms. Jones went to assist him with that, Mr. Remete told her that this was "man's work" and to "get out of my damn way." (Jones Dep. 126:16–127:4.) According to Ms. Jones, however, Mr. Remete called other people "stupid" as well, including Brian Pankhurst, the other Field Manager (Jones Dep. 128:5–7), and would "scream" at cafeteria managers during meetings. (Jones Dep. 118:2–10.) Mr. Remete disputes all these allegations.

---

[3] Mr. Parkhurst's date of birth is December 2, 1976. He is approximately fifteen years younger than Ms. Jones, whose date of birth is October 25, 1961.

Another time, following a monthly managers meeting, Mr. Remete told Ms. Jones to "take her fat, stupid, old ass home." (Jones Dep. 22:3–12.) Judith Fitzgerald, cafeteria manager at Franklin High School and Ms. Jones's friend, overheard this statement. (Fitzgerald Dep. (ECF No. 33-6) at 34:14–35:7.) In March 2009, Mr. Remete called Ms. Jones into her office and "screamed" at her for something that actually was Mr. Parkhurst's responsibility. (Jones Dep. 92:2–16.)

In the course of this same conversation, Mr. Remete asked why they did not have labels on their products, and Ms. Jones said, "those are the boxes that you went around to all the schools and threw away." (Jones Dep. 94:7–11.) He called her into his office because of this comment. Jim Rose was also present. Mr. Remete yelled at Ms. Jones that he was "sick and tired of [her] running [her] mouth and repeating things that were said in the office." (Jones Dep. 95:17–20.) Ms. Jones attempted to defend herself, denying that she had behaved inappropriately and stating that she was "tired of being blamed for everything." (Jones Dep. 96:1–2.) According to Ms. Jones, during the course of this heated exchange, Ms. Jones said something like, "if I'm so bad, why don't you just transfer me back to a school where I can be a manager?" and Mr. Remete responded that she did not have "the integrity to be a manager." (Jones Dep. 96:11–15.) Ms. Jones said, "well, I guess I need to start looking for a job," but Mr. Remete told her, "no, Linda, you always have a job with me." (Jones Dep. 97:18–20.) Ms. Jones recalled that, during the course of the same conversation, Mr. Remete repeated again that he needed "new blood, just God give me new blood in here." (Jones Dep. 99:2–4.) At some point he also said: "I guess you're going to cry, that's what women do. You're going to cry now." (Jones Dep. 99:9–11.) Mr. Remete denies these allegations as well.

Ms. Jones states that in December 2008, Mr. Remete bought Mr. Parkhurst, the other Field Manager, a chef's shirt embroidered with his position. He did not offer Ms. Jones a similar shirt. In addition, he asked another male manager if he wanted a chef's jacket, but he did not offer one to any of the female managers. (Jones Dep. 118:21–119:6.)

Mr. Remete repeatedly "screamed" at Ms. Jones if she referred to him as "sir" when responding to his questions, telling her that she was older than he and should not refer to him as "sir." (Jones Dep. 128:24–129:1.) He commented in front of Ms. Jones that he was disgruntled about attending a "stupid reception that was for the losers that had done nothing but show up every day for twenty years to get their

certificates," when he knew that Ms. Jones was the only employee in her department being recognized for twenty years of service at that reception. (Jones Dep. 129:17–130:4.) On another occasion, in response to a question about how he liked working for the Williamson County schools, Mr. Remete stated that it would be fine if he did not have to work with Ms. Jones. He made this statement in Ms. Jones's presence and he did smile or laugh to indicate that he was joking, and the employees who witnessed the event did not appear to think he was joking. (Jones Dep. 172:11–173:7.)

Ms. Jones testified that Mr. Remete continually "harassed" her, such as by asking her why she had gone to the bathroom, why her face was red, and why she looked at him "like that." (Jones Dep. 107:1–7.) Mr. Remete asked her on at least one occasion if she wanted to "ride with the boys" or "hang out with the boys." (Jones Dep. 130:22–131:16.) The first few times Mr. Remete made offensive age- or gender-related comments to her, Ms. Jones told him that she was offended, but he responded by telling her to "get over it." (Jones Dep. 132:18–24.) Generally speaking, Ms. Jones felt that Mr. Remete abused her continuously, about everything she did, and made her feel that everything she did was wrong. (Jones Dep. 44:18-2-5.) She said: "I always felt as though Mr. Remete would never let me explain anything. He was too busy yelling, getting upset, he had no patience with anything I had to say. I rarely finished a complete sentence." (Jones Dep. 164:21–25.)

After Mr. Remete was hired, he trained Mr. Parkhurst on a new computer program, while Ms. Jones was in the field. Mr. Parkhurst later trained Ms. Jones on the same program, but Ms. Jones felt that Mr. Remete should have trained her as well as Mr. Parkhurst. Ms. Jones asserts that, over time, Mr. Parkhurst was given virtually all of Ms. Jones's job duties, except for making site visits and filling in for absent managers. (Jones Dep. 165:6–22.)

Ms. Jones went to the defendant's Human Resources ("HR") office on several occasions to complain about Mr. Remete, but she never actually lodged a formal complaint. (Pl.'s Answer. to Interr. No. 8.) Instead, the plaintiff states that she told HR secretary Costa Morgan in December 2008 that she wanted to file a complaint against Mr. Remete because, as Ms. Jones stated: "he was always making fun of my face and the way I spoke and yelling at me and calling me stupid and making women statements." (Jones Dep. 177:8–11.) Ms. Morgan advised her not to file a complaint but instead to "let this go for a little while longer and just see if . . . it settles down." (Jones Dep. 177:14–16.) According to Ms. Morgan, Ms.

Jones told her she had "personality conflicts" with James Remete but did not complain of age or gender discrimination or harassment. (Morgan Aff. (ECF No. 36-2) at ¶¶ 2–3.) Ms. Jones insists, to the contrary, she told Ms. Morgan that the harassment was age- and gender-related. (Jones Dep. 232:4–13.) In January 2009, Ms. Jones left a phone message and a post-it note for Eugene Wade in the HR office asking him to call her on an "urgent matter," but he did not respond. (Pl.'s Ans. to Interrog. No. 8; Jones Dep. 101:17–21.) In mid-March 2009, she tried to contact Mr. Wade again, unsuccessfully. (Pl.'s Ans. to Interrog. No. 8.) In mid-April 2009, she told Judith Looney that she "needed to file a complaint against James Remete for his behavior toward [her]" but was told that "no one was available to help [her]." (*Id.*) According to the plaintiff, she told Ms. Looney that she was "tired of being called stupid, . . . tired of his woman remarks, [and] tired of being told how old [she was]." (Jones Dep. 102:12–14.)

Ms. Jones testified that, approximately a month after she had spoken with Ms. Looney about filing a complaint, Mr. Remete called her into his office and told her she was not the "right fit" for the position of Field Manager. (Jones Dep. 148:7–13.) At the same time he handed her a letter dated May 15, 2009, signed by Judith Looney, advising her that her appointment as Field Manager was not being renewed after June 30, 2009 and that she was instead being offered the position of full-time cafeteria worker for the 2009–2010 academic year. (Jones Dep. 148:17; Jones Dep. Ex. 5 (ECF No. 22-12).) Ms. Jones accepted this reassignment, which entailed a substantial reduction in the number of hours worked and in Ms. Jones's hourly rate of pay. (Pl.'s Ans. to Interrog. No. 14; EEOC Charge (ECF No. 22-21).) There is no dispute that Mr. Remete was the sole decision maker regarding Ms. Jones's position with the defendant, and there is no evidence in the record that Mr. Remete was aware that Ms. Jones had complained about him to Ms. Looney or anyone else.

Ms. Jones contends that, even after she was demoted to cafeteria worker, Mr. Remete continued to harass her by showing up at the school to which she was assigned, referring to the kitchen where she worked as the place where the "old people" were, and asking her if she liked being with the "girls" more. (Jones Dep. 192:17–193:10.)

Ms. Jones testified that she contacted the Equal Employment Opportunity Commission ("EEOC") in March 2009 to file a complaint against the defendant based on Mr. Remete's conduct. (Jones Dep. 188:10–14.) She filled out an on-line questionnaire at that time, complaining of a specific instance of Mr.

Remete's behavior in March 2009 (*see* EAS Questionnaire (ECF No. 33-9), and then waited for the EEOC to contact her. She received a letter from the EEOC dated May 26, 2009, advising her that it needed more information and suggesting an interview. (ECF No. 33-8.) Ms. Jones filed a formal charge of discrimination with the EEOC dated June 18, 2009, in which she alleges that she was subjected to retaliation and discrimination based on age and gender dating from November 18, 2008 through May 15, 2009. (EEOC Charge (ECF No. 22-24).) There is no evidence that the defendant or any of the defendant's employees was aware that Ms. Jones had contacted the EEOC until after she filed the formal charge in June 2009.

Ms. Jones held the cafeteria-worker position for a year. In August 2010, she was notified by the defendant that her position as cafeteria worker was not being renewed for the 2010–2011 school year. Following her non-renewal, the plaintiff's cafeteria-worker position was not filled; instead, the plaintiff's job duties were redistributed among other workers. Mr. Remete testified that he was unaware that the plaintiff was not sent a rehire letter for the 2010–2011 school year and did not find out that Ms. Jones was not rehired for that school year until sometime in August 2010. (Remete Dep. 50:4–16.)

Ms. Jones retained an attorney concerning her discrimination charge in December 2010, and the EEOC investigation was concluded in October 2011. After his retention, Ms. Jones's attorney communicated directly with the EEOC. At no time did Ms. Jones or her attorney on her behalf file a new charge with the EEOC related to her separation from employment in August 2010 or amend the charge filed in June 2009.

II.     STANDARD OF REVIEW

In reviewing a motion for summary judgment, this Court will only consider the narrow question of whether there are "genuine issues as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A motion for summary judgment requires that the Court view the "'inferences to be drawn from the underlying facts . . . in the light most favorable to the party opposing the motion.'" *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). The opponent, however, has the burden of showing that a "rational trier of fact [could] find for the non-moving party [or] that there is a 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587. "The mere existence of a scintilla of evidence in

support of plaintiff's position[, however,] will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986). If the evidence offered by the nonmoving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249–52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 430 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247–49).

## III.    LEGAL ANALYSIS

The defendant has moved for summary judgment, asserting that it is entitled to judgment as a matter of law in its favor as to all claims asserted in the Amended Complaint.

### A.    Claims Under 42 U.S.C. § 1983

Count One of the Amended Complaint asserts claims under 42 U.S.C. § 1983. The plaintiff asserts that the defendant violated § 1983 when it "acted intentionally, recklessly, or maliciously when it demoted, harassed, retaliated against, and terminated" the plaintiff's employment and that the defendant's treatment of the plaintiff was "part of a knowing and intentional pattern of discrimination" in violation of § 1983. (Am. Complaint ¶¶ 20–21.)

Because there is no "statute of limitations governing § 1983 actions, 'federal courts must borrow the statute of limitations governing personal injury actions in the state in which the section 1983 action was brought.'" *Wolfe v. Perry*, 412 F.3d 707, 713–14 (6th Cir. 2005) (quoting *Banks v. City of Whitehall*, 344 F.3d 550, 553 (6th Cir. 2003)). Issues of tolling are likewise generally governed by state law. *See Johnson v. Ry. Express Agency*, 421 U.S. 454, 464 (1975) ("In virtually all statutes of limitations the chronological length of the limitation period is interrelated with provisions regarding tolling, revival, and questions of application. In borrowing a state period of limitation for application to a federal cause of action, a federal court is relying on the State's wisdom in setting a limit, and exceptions thereto, on the prosecution of a closely analogous claim."). However, a § 1983 action accrues and the statutory period begins to run according to federal law. *Wallace v. Kato*, 549 U.S. 384, 388 (2007). Typically, the statute of limitations for filing an action alleging a constitutional violation begins to run "when the plaintiff knows or has reason to know of the injury which is the basis of his action." *Eidson v. Tenn. Dep't of Children's*

*Servs.*, 510 F.3d 631, 635 (6th Cir. 2007) (citing *Kuhnle Bros., Inc. v. Cnty. of Geauga*, 103 F.3d 516, 520 (6th Cir. 1997)).

Under Tennessee law, the statute of limitations for civil actions brought under the federal civil rights statutes is one year. Tenn. Code Ann. § 28-3-104(a)(3). Tennessee law does not provide for the tolling of the statute of limitations governing civil-rights claims while a plaintiff pursues administrative remedies as required for a Title VII claim. *See Johnson v. Ry. Express Agency*, 421 U.S. at 466 (holding based on Tennessee state law that the plaintiff's § 1981 claim was not tolled pending exhaustion of his Title VII claim); *Simmons v. Middle Tenn. State Univ.*, 117 F.3d 1421 (Table), 1997 WL 400105, at *2–3 (6th Cir. July 11, 1997) (holding that Title VI claim was not tolled pending the plaintiff's pursuit of administrative remedies where the statute did not mandate exhaustion of administrative remedies); *Burnett v. Tyco Corp.*, 923 F. Supp. 1039, 1044 (W.D. Tenn. 1996) (noting that, under Tennessee law, claims brought under the Tennessee Human Rights Act are not tolled while administrative charges are pending).[4]

The plaintiff in this case alleges that she was demoted effective June 30, 2009 and that she was notified of her termination in August 2010. (Am. Compl. ¶ 18.) Accordingly, at the very latest, the one-year statute of limitations governing her § 1983 claim began to run in August 2010 and expired in August 2011. The complaint in this action was filed on January 13, 2012, well outside the one-year statute of limitations for § 1983 claims in Tennessee. Accordingly, the plaintiff's § 1983 claims are time-barred and the defendant is entitled to summary judgment with respect to those claims.

### B.     Title VII and ADEA Discrimination Claims Related to the May 2009 Demotion

Ms. Jones asserts that the Williamson County Board of Education discriminated against her on the basis of her age and gender, in violation of Title VII and the ADEA, when her supervisor, James Remete, decided not to renew her for the position of Field Manager at the close of the 2009–2010 school year, and instead offered her the position of cafeteria worker for the 2010–2011 year.

---

[4] The Supreme Court has recognized that "it is conceivable, and perhaps almost to be expected, that failure to toll will have the effect of pressing a civil rights complainant who values his § [1983] claim into court before the EEOC has completed its administrative proceeding. One answer to this, although perhaps not a highly satisfactory one, is that the plaintiff . . . may ask the court to stay proceedings [in the civil rights action] until the administrative efforts at conciliation and voluntary compliance [with respect to the Title VII claim] have been completed." *Johnson v. Ry. Express Agency*, 421 U.S. at 465.

### 1. Legal Standards

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Thus, claims based on gender discrimination are within the purview of Title VII. The ADEA likewise makes it unlawful for an employer "to fail or refuse to hire or to discharge . . . or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).

A plaintiff may establish a *prima facie* claim of employment discrimination under Title VII or the ADEA based upon direct or indirect, circumstantial evidence. Where only indirect evidence of discrimination is available, the claims are analyzed using the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under *McDonnell Douglas* and its progeny, the plaintiff must first make out a *prima facie* case of discrimination by showing: "(1) membership in a protected group; (2) qualification for the job in question; (3) an adverse employment action; and (4) circumstances that support an inference of discrimination." *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283 (6th Cir. 2012) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002)). If the plaintiff presents facts which, if true, would prove each of these elements, the burden then shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the termination. *McDonnell Douglas Corp.*, 411 U.S. at 802. "If the defendant meets this burden, then the burden of production shifts back to the plaintiff to demonstrate that the proffered reason is a pretext." *Blizzard*, 698 F.3d at 283 (quoting *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 615 (6th Cir. 2003)).

However, the *McDonnell Douglas* evidentiary framework is inapplicable where the plaintiff presents direct evidence of discrimination. *See Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) ("[T]he *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination . . . . The shifting burdens of proof set forth in *McDonnell Douglas* are designed to assure that the 'plaintiff has his day in court despite the unavailability of direct evidence.'"); *Scheick v. Tecumseh Pub. Schs.*, 766 F.3d 523, 529 (6th Cir. 2014) (noting that *Gross* did not alter the application of the *McDonnell Douglas* evidentiary framework to prove ADEA claims based on circumstantial evidence).

For both Title VII and ADEA claims, direct evidence is "evidence that proves the existence of a fact without requiring any inferences." *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004); *see also Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998) (direct evidence is "evidence from the lips of the defendant proclaiming his or her [discriminatory] animus" (citations and quotation marks omitted)). The Sixth Circuit had recognized that it is only in the "rare" case that a plaintiff will have direct evidence that the adverse employment action taken against her was motivated by discrimination. *Robinson v. Runyon*, 149 F.3d 507, 513 (6th Cir. 1998); *Kline v. Tenn. Valley Auth*, 128 F.3d 337, 348 (6th Cir. 1997). The direct evidence upon which a plaintiff seeks to rely must establish not only that a defendant was predisposed to discriminate on the basis of a protected characteristic, but also that the defendant acted on that predisposition in taking the adverse employment action in question. *DiCarlo v. Potter*, 358 F.2d 408, 415 (6th Cir. 2004), *abrogated in part on other grounds by Gross*, 557 U.S. at 177. To qualify as evidence of action on a discriminatory predisposition, there must be some nexus between the alleged statements and the subsequent adverse employment action. *Id.* at 416–17.

Whether the plaintiff presents direct or only indirect evidence, the burden of persuasion remains at all times on the plaintiff.

### 2.      *Direct Evidence of Discrimination*

In the Title VII context, direct evidence is evidence "which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (en banc). *See also Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 346 (6th Cir. 2012) (holding that, to prevail on a Title VII discrimination claim, the plaintiff "must establish that that the defendant had a discriminatory intent or motive for taking a job-related action," even if discriminatory animus was not the sole motive for the action (quoting *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009) (internal quotation marks omitted)). To prove an ADEA claim with direct evidence, however, the evidence must be sufficient to establish that "age was the 'but-for' cause of the employer's adverse action." *Gross*, 557 U.S. at 177. Thus, "[t]o prevail on direct evidence at the summary judgment stage . . . plaintiffs must prove by a preponderance of the evidence that age was the 'but-for' cause of the challenged employer decision." *Sharp v. Aker Plant Servs. Grp.*, 726 F.3d 789, 798 (6th Cir. 2013) (internal quotation marks, brackets, and ellipsis omitted); *see also Univ. of Tex. Sw. Med.*

*Ctr. v. Nassar*, 570 U.S. ----, 133 S. Ct. 2517, 2527 (2013) (holding that for an employer to take an adverse action "because of age" means "'that age was the "reason" that the employer decided to act.'" (quoting *Gross*, 557 U.S. at 176)).

In *DiCarlo*, the Sixth Circuit reversed summary judgment for the defendant on the plaintiff's national-origin discrimination claim, holding that the plaintiff had presented direct evidence of discriminatory animus where he alleged that his supervisor had called the plaintiff a "dirty wop" and complained that there were too many "dirty wops" working at the facility. *Id.* at 415. The court also found that the plaintiff had presented evidence that he was terminated "because of [his supervisor's] predisposition to discriminate on the basis of national origin" where the supervisor's "dirty wop" comments were made in close temporal proximity to the plaintiff's termination. *See id.* at 417 ("[T]he fact that the comments were made by Bailey, DiCarlo's immediate supervisor and a decision-maker, that they specifically negatively and derogatorily referenced DiCarlo's Italian-American heritage, and that the hate-speech occurred three weeks prior to DiCarlo's termination, all culminate in the conclusion that DiCarlo has presented sufficient evidence of causation to withstand summary judgment."). Conversely, however, the court observed that evidence of an "isolated discriminatory remark made by one with no managerial authority over the challenged personnel decisions" would not constitute direct evidence of discrimination. *Id.* at 416 (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 354 (6th Cir. 1998)).

In this case, the defendant argues that, while the plaintiff has "alleged that her supervisor made random comments about the age and gender of the Child Nutrition Department work force in general, she cannot establish a nexus between the comments allegedly made by her supervisor and the adverse employment action at issue" and therefore that she has not presented direct evidence of age or gender discrimination.

The Court disagrees. It is undisputed that Mr. Remete was Ms. Jones's direct supervisor and the person who had managerial authority over decisions affecting her employment. Ms. Jones has also alleged that Mr. Remete, on numerous occasions, commented to her that he "needed new blood," that the employees under him were "old," that he could hire younger workers for less money, and that he could hire two younger employees for the amount he paid the plaintiff. He also allegedly made gender-related remarks, including a comment about whether the plaintiff was going to cry after he reprimanded her, to

the effect of, "I guess you're going to cry, that's what women do. You're going to cry now." (Jones Dep. 99:9–11.) Ms. Jones also asserts that Mr. Remete asked her why there were so few male managers and stated that he wanted that he wanted "more males" and "pretty young girls" to work for him (Pl.'s Interrog. Answer No. 7).

The precise timing of most of these alleged statements is unclear, but Mr. Remete was Ms. Jones's supervisor beginning in November 2008, and he gave her notice of her demotion only six months later, in May 2009. Ms. Jones alleges that Mr. Remete's age- and gender-related comments were continuous throughout that time period. The most recent conversation she remembered in which Mr. Remete allegedly made derogatory comments to her based both on age and gender appears to have taken place in March or April 2009. Mr. Remete gave Ms. Jones notice of her demotion approximately one to two months later, in May 2009.

Based on *DiCarlo*, the Court finds that the plaintiff's testimony regarding Mr. Remete's statements to her constitutes direct evidence of gender- and/or age-based discrimination. Mr. Remete's alleged comments that he needed "new blood," that he could hire younger workers for less, that he could hire two younger workers for what he paid Ms. Jones, and that Ms. Jones was "old" are direct evidence of a discriminatory animus toward older workers. His alleged comments that he preferred to work with male managers and "pretty young" women, among others, also constitute direct evidence of a discriminatory animus toward women. In addition, the alleged statements were all made over a span of approximately two to five months before Mr. Remete gave Ms. Jones notice of her demotion. As previously stated, there is no dispute that Mr. Remete was the person who made the decision to demote Ms. Jones. Consequently, the evidence is sufficient to permit a finding that Mr. Remete acted on his discriminatory animus by demoting Ms. Jones, that is, that gender was a motivating factor in Mr. Remete's decision to terminate Ms. Jones, and/or that age was a but-for cause in his decision to demote her.

Because the Court finds that the plaintiff has presented direct evidence of both age and gender discrimination, in violation of Title VII and the ADEA, relating to the plaintiff's 2009 demotion, the defendant's motion for summary judgment as to these claims will be denied.

### 3. *Applying the* McDonnell Douglas *Framework*

Even if the Court were to find that the plaintiff had not presented direct evidence of either age or

gender discrimination, disputed issues of material fact would still preclude summary judgment for the defendant. The defendant does not dispute that, as a woman over the age of 40, Ms. Jones was a member of two protected groups, that she was qualified for the job in question, and that she suffered an adverse employment action when she was demoted. The defendant argues, however, that Ms. Jones cannot establish the fourth required element of a *prima facie* case because she was not replaced by a male or by someone younger. She was, instead, replaced by Mary Poteete, a woman over 40 years old who was less than three years younger than Ms. Jones.

Ms. Poteete, however, was not hired until more than a year after the plaintiff' was notified of her demotion, and Ms. Jones contends that she was treated less favorably than Brian Parkhurst, a similarly situated white male who had substantially less experience and seniority than the plaintiff. The defendant argues that Mr. Parkhurst was not similarly situated in all relevant respects because "Plaintiff has not alleged that Mr. Parkhurst engaged in the same conduct for which she was removed from her position." (ECF No. 21.)

In fact, Ms. Jones testified that Mr. Parkhurst made mistakes and engaged in behavior very similar to the behavior that supposedly motivated her demotion. Mr. Remete himself testified that Mr. Parkhurst had a difficult communication style. (Remete Dep. at 24:22–25:8.) In addition, as discussed below, Ms. Jones presents evidence sufficient to give rise to a question of fact as to whether the reasons proffered by Mr. Remete for her demotion were based in fact. Consequently, the Court finds that the evidence is sufficient to create a disputed issue of fact as to whether the plaintiff meets the fourth element of a *prima facie* case: "circumstances that support an inference of discrimination." *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283 (6th Cir. 2012).

The defendant posits legitimate, non-discriminatory reasons for the plaintiff's removal from her position as Field Manager: Mr. Remete testified that he concluded that Ms. Jones lacked interpersonal skills and was not able to communicate effectively with the cafeteria managers; she allegedly requested a demotion; she was allegedly not knowledgeable about the applicable food regulations and, despite instructions that she "learn the program," did not improve in that regard; and she "engaged in inappropriate work conduct" when she went to cafeteria managers directly to try to get an employee

transferred, without going through Mr. Remete or the Assistant Director, Jim Rose. (ECF No. 21, at 13.) The defendant argues that the plaintiff cannot establish that these reasons are pretextual.

"[A] reason cannot . . . be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (emphases and quotation marks omitted). In the Sixth Circuit, a plaintiff may establish pretext by showing that the employer's proffered reasons "(1) have no basis in fact; (2) did not actually motivate the action; or (3) were insufficient to warrant the action." *Seeger v. Cincinnati Bell Telephone Co.*, 681 F.3d 274, 285 (6th Cir. 2012) (citing *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)). "Whichever method the plaintiff employs, he always bears the burden of producing sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that the defendant . . . intentionally discriminated against him." *Id.* (citation and internal quotation marks omitted; alterations in original). The Sixth Circuit has also adopted the "honest belief rule," pursuant to which it is not enough simply to attack the credibility of the employer's proffered reason:

> Where the employer can demonstrate an honest belief in its proffered reason . . . , the inference of pretext is not warranted. Thus, this Circuit has adopted the "honest belief rule." Under [this] rule, an employer's proffered reason is considered honestly held where the employer can establish it reasonably reli[ed] on particularized facts that were before it at the time the decision was made. Thereafter, the burden is on the plaintiff to demonstrate that the employer's belief was not honestly held. An employee's bare assertion that the employer's proffered reason has no basis in fact is insufficient to call an employer's honest belief into question, and fails to create a genuine issue of material fact.

*Id.* (quoting *Joostberns v. United Parcel Servs., Inc.*, 166 F. App'x 783, 791 (6th Cir. 2006)).

Under this standard, the Court finds that the plaintiff's evidence, if believed by the jury, is sufficient to establish both that the reasons proffered by Mr. Remete had no basis in fact and that he did not reasonably rely on particularized facts in reaching the decision to demote Ms. Jones. The plaintiff's evidence suggests that she had long-standing relationships with the various cafeteria managers and did not have problems communicating with them. Mr. Remete offers only his own testimony and not that of the managers who allegedly complained about Ms. Jones's management style, and a jury could elect to credit Ms. Jones's testimony over Mr. Remete's. Mr. Remete claims that Ms. Jones "requested" a demotion, but his recollection of the event was vague. Ms. Jones testified that she referenced being moved back to the position of cafeteria manager but that the comment was made in the context of unwarranted criticism and harassment from Mr. Remete and could not reasonably have been construed

as an actual request for a demotion. Mr. Remete stated that he believed Ms. Jones was mistaken about the temperature to which chicken nuggets should be reheated. Even if she made this single mistake, Ms. Jones has presented evidence that she was well-versed in food safety and food-handling regulations, having gone above and beyond the required training. In addition, she testified that Mr. Remete wrongly, without attempting to ascertain the facts, blamed her for inappropriately circumventing Mr. Rose concerning a personnel issue, when she was instead acting at Mr. Rose's direction, and that Mr. Remete made a habit of blaming her for perceived problems without bothering to ascertain whether Mr. Parkhurst rather than Ms. Jones was the source of the problems. In light of this evidence, a reasonable jury could believe that Mr. Remete's proffered reasons for demoting Ms. Jones are pretextual.

Even under a *McDonnell Douglas* analysis, the defendant is not entitled to summary judgment on the plaintiff's claims of Title VII and ADEA discrimination in relation to her demotion from the position of Field Manager.

**C.     Title VII and ADEA Discrimination Claims Related to the August 2010 Termination**

The defendant observes in its motion that, although the plaintiff stated a claim related to the termination of her employment under § 1983, which is time-barred, it is "unclear from the Amended Complaint" whether the plaintiff intended to state claims under Title VII and the ADEA related to her non-renewal/termination from the position of cafeteria worker in August 2010. In an abundance of caution, the defendant moves for summary judgment as to any such claims, arguing that (1) the plaintiff failed to exhaust her administrative remedies with respect to any Title VII or ADEA claims related to her termination; and (2) she has no direct evidence of discrimination relating to her termination and cannot establish a *prima facie* case of discrimination using indirect evidence under the *McDonnell Douglas* burden-shifting standard.

The plaintiff's failure to address either of these arguments in her response in opposition to the motion for summary judgment constitutes a waiver of any argument she might have. "When a motion for summary judgment is properly made and supported and the nonmoving party fails to respond with a showing sufficient to establish an essential element of its case, summary judgment is appropriate." *Stansberry v. Air Wisc. Airlines Corp.*, 651 F.3d 482, 486 (6th Cir. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)); *Humphrey v. U.S. Att'y Gen.'s Office*, 279 F. App'x 328, 331 (6th Cir.

2008) ("[W]here, as here, plaintiff has not raised arguments in the district court by virtue of his failure to oppose defendants' motions to dismiss, the arguments have been waived.").

Regardless, even if the plaintiff had not waived the argument, it is clear that she cannot establish a *prima facie* case of discrimination in relation to her termination. Although, again, she is a woman over forty and therefore a member of two suspect classes, and her termination was indisputably an adverse employment action, Ms. Jones has not shown that she was replaced by someone outside the protected classes or that she was treated less favorably than similarly situated individuals outside the protected classes. The defendant has instead established that Ms. Jones was terminated as a result of a reduction in force and that she was not replaced after her termination. The plaintiff has not pointed to any evidence that she was singled out for discharge based on an impermissible characteristic. *See Skalka v. Fernald Envtl. Restoration Mgmt. Grp.*, 178 F.3d 414, 420 (6th Cir. 1999) ("In the context of a reduction in force, the fourth requirement [of a *prima facie* case] is modified to require the plaintiff to offer some direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." (citation and internal quotation marks omitted)).

The defendant is therefore entitled to summary judgment in its favor as to the plaintiff's discrimination claims related to the termination of her employment.

### D.    Title VII and ADEA Claims Related to Harassment/Hostile Work Environment

The defendant's motion for summary judgment and initial memorandum do not include any reference to a claim of harassment or hostile work environment. In her response to the motion, however, the plaintiff expressly argues that her claims "include hostile environment" (ECF No. 30, at 25) and that the defendant is not entitled to summary judgment on her hostile-work-environment claims. In its reply brief, the defendant points out that the plaintiff mentioned harassment in her complaint only in the context of her § 1983 claims, which are barred by the statute of limitations, and that the claims in Counts Two and Three, incorporating the plaintiff's Title VII and ADEA discrimination claims, do not include claims of harassment and hostile work environment. Instead, Counts Two and Three reference only disparate treatment in terms of the 2009 demotion. The defendant asserts that any hostile work environment claim "should be dismissed due to Plaintiff's failure to state a claim" that comports with Rule 8 of the Federal Rules of Civil Procedure. (ECF No. 35, at 9.)

In order to establish a claim of hostile work environment, a plaintiff must present evidence that she is a member of a protected class, that she was subjected to harassment based on her membership in the protected class, and "the harassment had the effect of unreasonably interfering with her work performance and creating an objectively intimidating, hostile, or offensive work environment." *Grace v. USCAR*, 521 F.3d 655, 678 (6th Cir. 2008). The evidence in the record arguably supports a claim of hostile work environment.

The Court agrees, however, that the plaintiff has not adequately pleaded a claim of hostile work environment in the Amended Complaint under Rule 8 of the Federal Rules of Civil Procedure. Nonetheless, Rule 15 permits amendments to pleadings whenever justice requires, Fed. R. Civ. P. 15(a)(2), including during and after trial. *See* Fed. R. Civ. P. 15(b)(1) ("The court should freely permit an amendment [based on an objection at trial] when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits."). In this case, a claim of hostile work environment is arguably incorporated in the plaintiff's EEOC charge, and allegations regarding hostile work environment or harassment were addressed in the plaintiff's interrogatory answers and deposition testimony. It therefore appears that the defendant would not be prejudiced by permitting amendment of the complaint to include a claim of hostile work environment. In light of the Court's determination that the defendant is not entitled to summary judgment in its favor on the plaintiff's Title VII and ADEA discrimination claims related to her demotion, the Court finds that the plaintiff should also be permitted to proceed on a theory of hostile work environment.

The defendant does not move for summary judgment on the merits of the hostile-work-environment claim, instead arguing only that the claim is inadequately pleaded. The Court finds that summary judgment on the merits at this stage is not warranted, nor is it appropriate to dismiss a claim that has not actually been pleaded in the Amended Complaint. If the plaintiff intends to pursue claims of hostile work environment under Title VII and/or the ADEA, she must seek to amend her complaint to assert such claims. [5]

---

[5] In addition, if the motion is granted and the defendant believes it necessary, it has the option of moving to reopen discovery for the limited purpose of further exploring the evidence related to such a claim.

### E.    Retaliation Claims

Ms. Jones's original complaint, filed in January 2012, included a Count Four, which asserted a claim of "retaliation" based on allegations that the defendant's "intentional acts and omissions as described [in the complaint] constitute[d] adverse employment actions of retaliation for complaining of discrimination [and] filing charges under either Title VII or the Tennessee Human Rights Act." (ECF No. 1, at ¶ 34.) The Amended Complaint, filed on October 9, 2012, omitted Count Four entirely. In addition, the complaint was further amended by agreement of the parties, as documented in an order entered by Magistrate Judge Juliet Griffin on October 15, 2012 (ECF No. 18), to remove all references to "common law retaliation" and Tennessee state law.

Apparently in reliance upon the plaintiff's voluntary relinquishment of Count Four, the defendant's initial summary judgment filings do not address any retaliation claim, except to argue that all § 1983 claims asserted in Count One, including retaliation, are barred by the statute of limitations. In her response in opposition to the defendant's motion, however, the plaintiff included a section arguing that "[s]ummary [j]udgment is inappropriate on Plaintiff's [r]etaliation claims." (ECF No. 30, at 19.) In support of that argument, Ms. Jones asserts that Title VII prohibits both discrimination and retaliation. (*Id.* at 19–20 (quoting 42 U.S.C. § 2000e-3(a)).) She further argues that informal complaints to superiors qualify as protected activity under Title VII and that she has established a *prima facie* case of retaliation.

In its reply brief, the defendant argues that it is entitled to summary judgment as to any retaliation claims, because (1) the plaintiff expressly abandoned any retaliation claim that was previously articulated in Count Four of the original complaint; (2) her retaliation claim under § 1983 is barred by the statute of limitations; and (3) she did not properly plead a claim of retaliation in violation of Title VII or the ADEA in Count Two or Count Three of the Amended Complaint. The Court agrees, as set forth above, that any claim under § 1983 is barred by the statute of limitations and that the plaintiff voluntarily relinquished any claim stated in Count Four of the original complaint. The plaintiff does not appear to dispute either of these conclusions. Further, as discussed below, the Amended Complaint, however broadly construed, does not set forth a retaliation claim under Title VII and the ADEA.[6] In light of the fact that the plaintiff

---

[6] In her response brief, the plaintiff actually does not reference a claim of ADEA retaliation, the scope of which, in any event, would be basically coextensive with a retaliation claim under Title VII. *See*

voluntarily abandoned the retaliation claims set forth in Count Four, it would not be reasonable at this stage to permit her to amend the complaint again to reinstate such claims. Moreover, even if that were not the case, the undisputed facts in the record mandate summary judgment in the defendant's favor as to any retaliation claims.

First, the Amended Complaint does not allege facts supporting a retaliation claim. The plaintiff alleges that Mr. Remete, throughout the period of time that he functioned as Ms. Jones's supervisor, continuously made comments and "derogatory remarks" about the plaintiff's age. (Am. Compl. ¶ 11). The plaintiff further alleges that she began, at some point, to "complain[] to Human Resources about [Mr. Remete's] harassment and creating a hostile environment" but that the defendant "failed to remedy the situation." (Am. Compl. ¶ 12.) She also alleges that, "[t]hroughout the spring of 2009, [Mr. Remete] singled her out and ridiculed her job performance without cause and falsely accused her of misconduct" and that she "complained on multiple occasions." (Am. Compl. ¶. 18.) She then states that she was demoted in May, filed her EEOC charge in June of 2009, and was notified in August 2010 that her employment had been terminated. (*Id.*) In other words, the plaintiff appears to fault the defendant's HR department for failing to take action against James Remete for his allegedly harassing behavior, but the Amended Complaint does not expressly state that Ms. Jones complained to HR that Mr. Remete's harassment was based on gender or age, nor do the plaintiff's factual allegations suggest a direct causal relationship, aside from temporal proximity, between the plaintiff's complaints about Mr. Remete and her demotion in May 2009.

To compound the ambiguity in the factual allegations, the Amended Complaint does not use the term "retaliation" in Count Two or Three, nor do these counts incorporate claims of "discrimination" based on opposing any unlawful employment practice.[7] In Count Two, which asserts claims under Title VII, the

---

*Penny v. United Parcel Serv.*, 128 F.3d 408, 417 (6th Cir. 1997) ("Retaliation claims are treated the same whether brought under the ADEA or Title VII.").

[7] Title VII defines the term "unlawful employment practice" to encompass "[d]iscrimination" on the basis of "oppos[ing] any practice made an unlawful employment practice by this subchapter, or . . . mak[ing] a charge . . . under this subchapter." 42 U.S.C. § 2000e-3(a); *see also Univ. of S. Tex. Med. Ctr. v. Nassar*, 568 U.S. ----, 133 S. Ct. 2517, 2522 (2013) (distinguishing between Title VII's prohibition against "status-based discrimination," that is, "employer discrimination on the basis of race, color, religion, sex, or national origin, in hiring, firing, salary structure, promotion and the like," incorporated in 42 U.S.C. § 2000e-2(a), and the statute's prohibition of discrimination in the form of "employer retaliation on account

plaintiff states that the defendant "denied [her] job opportunities, which were afforded to a younger, less qualified male" (Am. Compl. ¶ 26), that "[t]his discrimination" (expressly referring to the denial of job opportunities) "constitutes a violation of the Plaintiff's rights under Title VII" (Am. Compl. ¶ 27), and that such "discriminatory practices" caused the plaintiff to experience harm. (Am. Comp. ¶ 28.) Likewise under Count Three, which asserts violations of the ADEA, the plaintiff refers only to discrimination that was manifested by the deprivation of employment opportunities based on her age. (Am. Compl. ¶¶ 29, 31–33.) Based on the wording of Counts Two and Three, together with the absence of factual allegations that clearly support a Title VII or ADEA retaliation claim and the plaintiff's express abandonment of Count Four (which did expressly refer to Title VII retaliation), the Court finds that the complaint does not contain "a short and plain statement of the claim showing that the pleader is entitled to relief" on the basis of Title VII or ADEA retaliation. Fed. R. Civ. P. 8(a)(2); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (holding that the pleading requirements of Rule 8(a) are met when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007))).

Further, even if the Court were inclined to permit a belated amendment to the complaint to add back a retaliation claim, such an amendment would be futile. To establish a *prima face* case of retaliation under Title VII, the terminated employee must show that "(1) [s]he . . . engaged in protected activity, (2) the employer knew of the exercise of the protected right, (3) an adverse employment action was subsequently taken against the employee, and (4) there was a causal connection between the protected activity and the adverse employment action." *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 435 (6th Cir. 2009) (quoting *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008)). The Supreme Court has recently clarified the causation standard required to prove Title VII retaliation, stating: "[A] plaintiff making a retaliation claim under § 2000e-3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer," as distinct from "a motivating factor," which had previously been the standard in the Sixth Circuit. *Univ. of Tex. SW. Med. Ctr.*, 133 S. Ct. at 2533. In other words, in this context, but-for causation requires proof that the defendant would not have terminated the

of an employee's having opposed, complained of, or sought remedies for, unlawful workplace discrimination," set forth in § 2000e-3(a)).

plaintiff if she had not complained about gender and age discrimination.

Ms. Jones has arguably presented evidence that she engaged in protected activity when she complained to other employees that Mr. Remete was harassing her on the basis of her age and gender. She spoke to her friend Judy Fitzgerald, and she also allegedly told two employees in the HR office that Mr. Remete had made disparaging remarks to her based on her age and gender. (Jones Dep. 100:12–103:22, 232:4–13.) *See Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579–80 (6th Cir. 2000) ("Under Title VII, an employee is protected against employer retaliation for opposing any practice that the employee reasonably believes to be a violation of Title VII. The [EEOC] has identified a number of examples of 'opposing' conduct which is protected by Title VII, including complaining to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices.").

However, although the demotion letter was drafted by Judith Looney (ECF No. 22-12), it is undisputed that James Remete alone made the decision to remove Ms. Jones from the Field Manager position, and there is no evidence that Mr. Remete was aware that Ms. Jones complained to anyone that he was making harassing comments based on her age and gender. Generally, to establish the second element of her *prima facie* case of retaliation, a plaintiff must show that the person who made the decision to take an adverse employment action knew of her protected activity. *See, e.g.*, *Ramirez v. Gonzales*, 225 F. App'x 203, 210 (5th Cir. 2007) ("Without any evidence that Hohle knew of Ramirez's complaint when she decided to terminate Ramirez three months later, Ramirez cannot establish a *prima facie* case of retaliation."); *Williams v. Rice*, 983 F.2d 177, 181 (10th Cir. 1993) (holding that to establish *prima facie* case of retaliation, plaintiff must demonstrate that individual alleged to have taken adverse action knew of plaintiff's protected activity), *quoted in Dickman v. Lahood*, No. 13-3194, 2015 WL 150342, at *4 (10th Cir. Jan. 13, 2015). She therefore cannot establish a *prima facie* claim of retaliation related to the demotion.

Nor has the plaintiff established a *prima facie* retaliation claim related to her termination, because she cannot establish a causal connection between the protected activity (filng an EEOC charge) and the adverse action (termination or non-renewal of employment). The plaintiff asserts that her termination occurred mere "months" after she filed her EEOC charge. In fact, her EEOC charge was filed in June 2009, and the non-renewal decision apparently took place in May 2010 (although the plaintiff was not notified of the decision until August 2010). In the absence of any other evidence of causation, a temporal

distance of nearly a year between the protected activity and the adverse action does not constitute evidence of a causal connection for purposes of establishing a *prima facie* case. *See, e.g., Akers v. County of Bell*, 498 F. App'x 483, 487 (6th Cir. 2012) ("[T]his Court has found a causal link when the temporal gap is short, generally fewer than six months."); *Imwalle v. Reliance Medical Products, Inc.*, 515 F.3d 531, 550 (6th Cir. 2008) ("In this circuit, a period of more than four months was found to be too long to support an inference of causation.").

In sum, the Court finds first that the plaintiff affirmatively abandoned a Title VII retaliation claim when she removed Count Four from the Amended Complaint and that she did not plead a claim of retaliation in violation of either Title VII or the ADEA elsewhere in the Amended Complaint. Even if she had, however, she has not established a *prima facie* claim of Title VII or ADEA retaliation. The Court will therefore grant summary judgment in favor of the defendant as to any remaining retaliation claims in the Amended Complaint.

IV.    **CONCLUSION**

As set forth herein, the Court finds that the defendant has not established that it is entitled to summary judgment as to the plaintiff's claims of discrimination in violation of Title VII or the ADEA related to her 2009 demotion. Although the plaintiff failed to plead a claim of hostile work environment in her complaint, she may seek leave to amend her complaint to assert such a claim. The defendant has not sought summary judgment on the merits of a hostile-work-environment claim, and the Court will deny the motion for summary judgment as to that claim. The defendant, however, is entitled to summary judgment in its favor as to any claims under 42 U.S.C. § 1983, any claims of retaliation under Title VII or the ADEA, and any claims related to the termination of the plaintiff's employment.

An appropriate order is filed herewith.

KEVIN H. SHARP
Chief Judge
United States District Court